ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| NEREIDA VARGAS MATOS, POR SÍ Y EN REPRESENTACIÓN DE SUS DOS HIJOS JOWAN DARIEL VARGAS Y DHAEL YOMAR VARGAS; IRIS DELIA MATOS CASIANO Y JUAN VARGAS MORALES<br><br>Apelantes<br><br>v.<br><br>HOSPITAL METROPOLITANO DR. TITO MATTEI DE YAUCO; CONTINENTAL INSURANCE COMPANY, INC. DR. JUAN PILLOT COSTAS, SU ESPOSA FULANA DE TAL Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS; DRA. JANE DOE, SU ESPOSO JUAN DEL PUEBLO Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS; DR. JOHN DOE, SU ESPOSA JUANA DEL PUEBLO Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS; CORPORACIÓN X, ASEGURADORA Y, ASEGURADORA Z<br><br>Apelados | KLAN202200901 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala de Ponce<br><br>Civil Núm.: J DP2017-0180<br><br>Sobre: Daños y Perjuicios |

Panel especial integrado por su presidenta, la juez Grana Martínez, el juez Rodríguez Flores y la juez Aldebol Mora.

Aldebol Mora, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 19 de julio de 2024.

Comparece la parte apelante, Nereida Vargas Matos, por sí y en representación de sus dos hijos, Jowan Dariel Vargas y Dhael Y-Omar Vargas; Iris Delia Matos Casiano y Juan Vargas Morales, mediante el presente recurso de apelación, y nos solicita que revoquemos la *Sentencia* emitida y notificada por el Tribunal de Primera Instancia, Sala Superior de Ponce, el 12 de octubre de

2022. Mediante dicho dictamen, el foro primario concluyó que la parte apelante no probó que el tratamiento médico que brindó la parte apelada, el Dr. Juan Pillot Costas, fuera negligente, ni que se desviara del estándar de la mejor práctica de la medicina en el manejo de la paciente. En virtud de ello, desestimó la demanda incoada por la parte apelante en contra del Dr. Juan Pillot Costas.

Por los fundamentos que exponemos a continuación, se modifica y, así modificada, se confirma el dictamen apelado.

**I**

El 6 de junio de 2017, Nereida Vargas Matos (Vargas Matos), por sí y en representación de sus dos hijos, Jowan Dariel Vargas (Jowan Vargas) y Dhael Y-Omar Vargas (Dhael Vargas); Juan Vargas Morales (Vargas Morales) e Iris Delia Matos Casiano (Matos Casiano) (apelantes) incoaron una *Demanda* de daños y perjuicios en contra del Hospital Metropolitano Dr. Tito Mattei de Yauco (Hospital Pavía de Yauco), Continental Insurance Company, Inc. (Continental Insurance), Dr. Juan Pillot Costas (Dr. Pillot Costas o apelado), su esposa y la sociedad legal de gananciales compuesta por ambos.[1] En síntesis, solicitaron una indemnización por los daños sufridos por Vargas Matos a consecuencia de la negligencia del personal del Hospital Pavía de Yauco. Argumentaron que, al no haber actuado oportunamente, conforme a las normas aceptadas en la medicina, Vargas Matos sufrió un deterioro neurológico permanente. Entre los daños físicos que, según arguyeron, experimenta Vargas Matos, se encuentra la pérdida de su capacidad para hablar, sumar y restar. En mérito de lo antes expuesto, solicitaron una cantidad no menor de $35,000.00 para resarcir los daños.

Sostuvieron que, el 20 de agosto de 2015, Vargas Matos dio a luz a su hijo Dhael Vargas en el Hospital Metropolitano de San

---

[1] Apéndice III del recurso, págs. 37-44.

Germán; dada de alta dos días después. Posteriormente, el 2 de septiembre de 2015, mientras veía televisión en su casa junto a su recién nacido, súbitamente sintió un fuerte dolor en su cabeza, así como en las extremidades del lado izquierdo de su cuerpo, y comenzó a manifestar fuertes movimientos involuntarios. Su padre, Vargas Morales, quien estaba presente al momento de los hechos, la llevó a la sala de emergencias del Hospital Pavía de Yauco.

Alegaron que Vargas Matos llegó a la referida sala de emergencias el 2 de septiembre de 2015, a las 11:29pm. Narraron que, durante la espera, el estado de salud de Vargas Matos fue deteriorándose hasta tener total dificultad en sus movimientos motores. Especificaron que, al llegar a la sala de emergencias, Vargas Matos mostraba una evidente parálisis facial, no podía hablar ni permanecer parada y presentaba serios problemas de razonamiento. Abundaron que, para atender este asunto, el 3 de septiembre de 2015 fue sometida a un CT Scan de cerebro con contraste. Indicaron que, el 4 de septiembre de 2015, mientras Vargas Matos aún permanecía en la sala de emergencias, a las 8:00am se le ordenó otro CT Scan de cerebro con y sin contraste. Sobre ese particular, añadieron que la interpretación de dicho examen fue firmada a las 11:28am y demostró que los hallazgos eran compatibles con un infarto agudo. Señalaron que, ese mismo día, Vargas Matos fue admitida en el mencionado hospital a las 3:45pm por orden del Dr. Pillot Costas.

Asimismo, plantearon que, del récord médico surgía que la única consulta a un especialista en neurología fue realizada el 4 de septiembre de 2015, repetida al día siguiente, contestada aproximadamente 105 horas después de Vargas Matos haber llegado a la sala de emergencias el 7 de septiembre del mismo año

a las 8:49am.[2] De la referida consulta, alegaron que el neurólogo realizó más de 16 recomendaciones a Vargas Matos, las cuales alegadamente no fueron llevadas a cabo por el Dr. Pillot Costas, ni por el Hospital Pavía de Yauco. Indicaron que Vargas Matos fue dada de alta del mencionado hospital el 7 de septiembre del 2015 a las 11:00am.

Describieron que, el 6 de octubre de 2015, Vargas Matos fue llevada al Hospital de la Concepción donde le informan que sufrió un segundo infarto, por lo cual fue hospitalizada de inmediato hasta el 21 de octubre de 2015. Arguyeron que la ocurrencia del primer y segundo infarto de Vargas Matos, así como su segunda hospitalización, ocurrió como consecuencia de la omisión del tratamiento recibido en el Hospital Pavía de Yauco del 2 al 7 de septiembre de 2015. Particularmente, sostuvieron que Vargas Matos no fue evaluada adecuadamente, ni con la urgencia que merecía en la Sala de Emergencias. A consecuencia de esto, alegaron que Vargas Matos sufrió un daño neurológico permanente. Adujeron que, cuando el personal de la sala de emergencia del Hospital Pavía de Yauco fue notificado de la condición de Vargas Matos tan pronto llegó al hospital, esta no fue evaluada adecuadamente. Sostuvieron que, todo lo antes expuesto, le ocasionó serios daños emocionales y angustias mentales a Vargas Matos, sus hijos y sus padres.

En cuanto a la alegación de negligencia en contra del Dr. Pillot Costas, alegaron que este, conociendo la evidencia de la condición neurológica de Vargas Matos, no fue celoso con el seguimiento de su consulta con el neurólogo, causando que la misma fuese contestada aproximadamente 72 horas después, lo cual no iba acorde con las mejores prácticas de la medicina. En

---

[2] Véase, alegación #11 del Apéndice III del recurso, pág. 40.

vista de ello, sostuvieron que tanto el galeno como el hospital eran responsables por la tardanza de dicha evaluación neurológica.

Por otro lado, alegaron que el Hospital Pavía de Yauco fue negligente al no dar seguimiento oportuno a la consulta al neurólogo; no informar a tiempo al Dr. Pillot Costas y/o buscar otro neurólogo y/o transferir a Vargas Matos a otro hospital que tuviese un servicio de neurología. Por ello, arguyeron que el mencionado hospital era solidariamente responsable por todas las actuaciones y omisiones de los doctores que le asignó a Vargas Matos.

Por su parte, el 18 de agosto de 2017, el Hospital Pavía de Yauco y Continental Insurance presentaron una *Contestación a Demanda*.[3] Entre las defensas afirmativas, sostuvieron que los hechos alegados en la demanda no justificaban la concesión de un remedio a favor de la parte apelante y en contra del Hospital Pavía de Yauco. Negaron la existencia de una relación causal entre la alegada acción y/u omisión negligente y los presuntos daños sufridos por Vargas Matos. De igual forma, arguyeron que el hospital cumplió con las normas de atención hospitalaria exigibles en Puerto Rico y que los daños sufridos por Vargas Matos no fueron causados por el tratamiento, cuidado y atención hospitalaria del personal médico del hospital. Plantearon que, de haber mediado negligencia, lo cual negaron, la misma fue incurrida por terceras personas. En la alternativa, expusieron que existía un error de juicio y/o un error de juicio honesto y alegaron que el Dr. Pillot Costas no era empleado del hospital. Por todo lo antes mencionado, solicitaron que se declarara No Ha Lugar la *Demanda,* con imposición a la parte apelante de costas, gastos y honorarios de abogado.

---

[3] Anejo IV del recurso, págs. 45-49.

Así las cosas, el 20 de octubre de 2017, el Dr. Pillot Costas presentó una *Moción de Sentencia Sumaria Solicitando la Desestimación por Prescripción.*[4] En desacuerdo, la parte apelante se opuso.[5]

El 6 de agosto de 2018, el Dr. Pillot Costas presentó su correspondiente *Contestación a la Demanda.*[6] Como primera defensa afirmativa, sostuvo que la acción de epígrafe estaba prescrita, ya que los hechos ocurrieron del 4 al 7 de septiembre de 2015 y la *Demanda* se radicó el 6 de junio de 2017. Argumentó que no medió una reclamación extrajudicial válida en derecho. Por otro lado, expuso que no fue negligente ni actuó culposamente en el tratamiento brindado a Vargas Matos. Alegó que brindó la mejor evaluación, diagnóstico y atención médica a la luz de los modernos medios de comunicación y enseñanza en la especialidad de la medicina de familia y cuidado hospitalario; que no existía relación causal entre los daños alegados por la parte apelante y las alegadas actuaciones u omisiones que se le imputaron; y que los daños reclamados eran excesivos e improcedentes en derecho. Asimismo, adujo que, el hecho de que le ocurriera un daño al paciente posterior al tratamiento médico ofrecido no activaba la norma de responsabilidad absoluta. Por lo antes expuesto, solicitó la desestimación de la *Demanda*.

Entre las partes se realizó un extenso descubrimiento de prueba que culminó con la preparación y aprobación del Informe de Conferencia con Antelación a Juicio (Informe) el 28 de octubre de 2021. En ese Informe, se le notificó al tribunal que la parte apelante y el Hospital Pavía de Yauco alcanzaron un acuerdo transaccional. A esos efectos, el 7 de febrero de 2022, el foro *a quo*

---

[4] Cabe señalar que del expediente ante nos no surge la referida moción. Sin embargo, el foro primario hace referencia a esta en la *Sentencia* apelada. Véase, Apéndice I del recurso, pág. 12.
[5] Apéndice XII del recurso, págs. 231-239.
[6] Apéndice V del recurso, págs. 50-54.

notificó una *Sentencia Parcial*.[7] En esencia, desglosó las partidas a ser concedidas y mantuvo en el pleito al Dr. Pillot Costas.

Luego de varias incidencias procesales, se celebró el juicio en su fondo el 14, 17 y 18 de marzo, y el 5 de abril de 2022.

Pendiente de adjudicación la controversia sobre prescripción, en la transcripción de la prueba oral quedó plasmado el intento de Dr. Pillot Costas de traer a la atención dicho asunto.[8] Sostuvo que, como primera alegación responsiva, había radicado una moción de sentencia sumaria solicitando la desestimación de la demanda por prescripción. Indicó que acompañó su moción con la carta de reclamación extrajudicial en cuestión, con fecha del 1 de septiembre de 2016, así como una contestación a esta por parte del Lcdo. Armstrong Cortada del 16 de septiembre de 2016. Arguyó que la misiva no cumplía con los parámetros jurisprudencialmente pautados para ser considerada como una reclamación extrajudicial que interrumpiera el término prescriptivo aplicable. Adujo que, para que las reclamaciones extrajudiciales surtieran el efecto de interrumpir el curso de la prescripción extintiva de las acciones, debían ser específicas y dirigidas contra la parte obligada al cumplimiento de las obligaciones de cuya prescripción se trataba. De igual forma, el galeno declaró que, luego de que Vargas Matos salió de su cuidado médico en el Hospital Pavía de Yauco, tenía una recomendación de ir a su oficina en una semana. Alegó que Vargas Matos no siguió dicha recomendación y que el próximo conocimiento que él tuvo al respecto fue cuando recibió copia de la *Demanda.* Asimismo, sostuvo que, en la carta se le informó que Vargas Matos había adquirido representación legal, mas no se incluyó nada respecto a la posible causa de acción que tuvieron los demás codemandantes

---

[7] Apéndice VI del recurso, págs. 55-57.
[8] Véase, Transcripción de la Prueba Oral, Tomo I (TPO), págs. 495-500.

del caso. Particularizó que solo se hizo referencia a que la paciente Vargas Matos fue atendida del 2 al 7 de septiembre del 2015 en el Hospital Pavía de Yauco, y que fue dada de alta por recomendación de este. Planteó que la referida misiva no hacía un señalamiento de negligencia o de que se había ocasionado un daño a consecuencia del tratamiento médico provisto por este, sino que simplemente era una perspectiva. Argumentó que en ningún momento se le hacía un planteamiento de reclamación, sino que le informaron que estaban evaluando el tratamiento brindado y solicitaron el récord médico de Vargas Matos específicamente el de su oficina. Por ello, reiteró que la referida carta pretendía ser una reclamación extrajudicial; sin embargo, indicó que en esta no se informó la ocurrencia del algún daño, ni cumplía con los elementos establecidos en el Artículo 1802 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 5141.

De igual forma, el Dr. Pillot Costas sostuvo que Vargas Matos y los demás codemandantes tuvieron tiempo para interrumpir propiamente el término prescriptivo de la acción y no lo hicieron. Por lo tanto, argumentó que, para el tiempo que radicaron la acción, la misma ya estaba prescrita. Sobre ese particular, especificó que la acción de Vargas Matos estaba prescrita porque no se interrumpió el término correctamente, y que la acción de los codemandantes Matos Casiano y Vargas Morales estaba prescrita porque nunca interrumpieron el término extrajudicialmente, por lo que la acción fue presentada fuera del término prescriptivo de un (1) año.

En respuesta, la parte apelante sostuvo la validez de la reclamación extrajudicial de Vargas Matos en que la ley no exigía una forma especial de presentar la misma para que tuviese el efecto de interrumpir el término prescriptivo de una acción. Sin embargo, no hizo argumento alguno sobre la prescripción de la

acción en cuanto a los demás codemandantes, Vargas Morales y Matos Casiano.[9]

Sin adjudicar la controversia sobre prescripción, el foro apelado continuó con el juicio en su fondo para determinar la existencia de impericia médica. El 13 de octubre de 2022, el foro primario emitió la *Sentencia* que nos ocupa. En la misma, determinó que la parte demandante no probó que el tratamiento médico que brindó el Dr. Pillot Costas a Vargas Matos fuese uno negligente, que se desviara del estándar de la mejor práctica de la medicina. Por lo que concluyó que el Dr. Pillot Costas no actuó negligentemente en su proceder médico y, por lo tanto, correspondía desestimar la demanda presentada en su contra. No obstante, con relación al asunto de prescripción, el Tribunal reconoce en su *Sentencia* que, finalizada la prueba testifical y pericial de ambas partes, la parte apelada presentó nuevamente una solicitud de desestimación por prescripción ya que la misma había quedado en suspenso por la Orden del Tribunal del 25 de enero de 2018. De igual forma, el foro *a quo* estableció que se presentó una *Moción de Desestimación* en los méritos del caso a base de la prueba pericial traída a la atención del Tribunal por las partes en el caso. Por lo tanto, sostuvo que luego de evaluar los argumentos presentados por ambas partes el mismo se encontraba en posición de resolverlas. Sin embargo, en ninguna parte de su *Sentencia,* dispuso sobre la solicitud de desestimación por prescripción. En la referida *Sentencia,* el foro de instancia plasmó las siguientes determinaciones de hecho:

1. La Sra. Nereida Vargas Matos, el 20 de agosto de 2015 dio a luz a su hijo Dhael Y-Omar Vargas en el Hospital Metropolitano de San Germán. Fue dada de alta el día 22 de agosto de 2015.

2. La Sra. Nereida Vargas Matos llega a la Sala de Emergencias del Hospital Tito Mattei de Yauco el 2 de septiembre de 2015 a las 11:29 de la noche. Permaneció en Sala de Emergencias hasta el 4 de septiembre de 2015 a las 3:45 de la tarde cuando es admitida al hospital por orden del Dr. Juan Pillot Costas.

[9] Véase, TPO, págs. 500-503.

3. El 3 de septiembre de 2015, se le realizó un CT Scan de cerebro [a] la Sra. Nereida Vargas Matos sin contraste el cual fue interpretado a las 12:09 de la tarde.

4. El 4 de septiembre de 2015 a las 8:00 de la mañana estando en la Sala de Emergencias se le ordenó hacer otro CT Scan de cerebro Con y Sin Contraste a la Sra. Nereida Vargas Matos. La interpretación de dicho examen fue firmada a las 11:28 am del mismo día y encontró que los hallazgos eran compatibles con un infarto agudo.

5. El 4 de septiembre de 2015 se realizó MRI de la cabeza sin contraste con lectura del 5 de septiembre de 2015 donde surge de que la impresión era haber sufrido un infarto agudo de los lóbulos temporal y parietal derecho extendiéndose a su ganglio basal. [*sic*]

6. El 7 de septiembre de 2015 el Dr. Méndez, Neurólogo, evaluó a la paciente y suscribió su diagnóstico y recomendaciones a la consulta solicitada por el Dr. Pillot.

7. La Sra. Nereida Vargas estuvo bajo el cuidado del Dr. Juan Pillot Costas desde el 4 de septiembre de 2015, a las 3:45 pm hasta el 7 de septiembre de 2015, a las 11:00am.

8. Los hechos por los que se reclamó al Dr. Juan Pillot Costas en este caso ocurrieron entre el 4 y 7 de septiembre de 2015.

9. La parte demandante, Nereida Vargas Matos, por conducto de su abogado el Lcdo. José M. Bracete Almodóvar le dirigió una carta el 1 de septiembre de 2016 al Dr. Juan Pillot Costas donde le indicaba que este había dado de alta a la paciente Nereida Vargas Matos el día 7 de septiembre de 2015 y le solicitaba el récord médico de la oficina del Dr. Juan Pillot Costas. En la carta se le expresa de que esta es una notificación de una reclamación extrajudicial que interrumpe el término prescriptivo para interponer una causa de acción. No existe ningún otro dato que permita al Dr. Juan Pillot Costas conocer la identidad de la paciente y darse por enterado en qué consiste esa posible reclamación.

10. La carta fue contestada por el Lcdo. Luis Armstrong Cortada el 15 de septiembre de 2016 indicando que Nereida Vargas Matos no era paciente de la oficina del Dr. Juan Pillot Costas y que no existe récord médico de esta en la oficina del doctor Pillot Costas y se acompañó certificación a esos efectos.

11. Los demandantes, Irís Delia Matos Casiano y Juan Vargas Morales no dirigieron carta de Reclamación Extrajudicial alguna al Dr. Juan Pillot Costas en una fecha posterior a ésta.

12. La parte demandante radicó su reclamación ante este Tribunal el día 6 de julio de 2017. Esto fue transcurrido el término prescriptivo de un (1) año contado a partir del 7 de septiembre de 2015.

13. Declaró la demandante, que es la paciente en esta reclamación, la Sra. Nereida Vargas Matos, que llegó al Hospital Metropolitano de Yauco que no podía sentarse, no podía dormir, ni hablar, sentía el lado izquierdo pesado, al despertar intentaba expresar que tenía dolor de cabeza, no podía respirar. Antes de llegar al hospital 1 o 2 semanas atrás dio a luz a un varón. No recuerda nada de la fecha en que llegó al hospital, solo que los paramédicos la dejaron en Sala de Emergencias, tenía dolor de cabeza, dolor en el pecho, falta de respiración, no podía, hablar. En la Sala de Emergencias se le fue el tiempo, los días, despertaba, se dormía, se orinaba encima, no se acuerda cuanto tiempo estuvo en la Sala de Emergencias, seguía el dolor de cabeza.

Que la subieron un piso, la sacaron de Sala de Emergencias no se acuerda de fechas, que seguía con el dolor de cabeza, con dolor

de pecho, que la llevaron a hacer MRI, que las enfermeras entraban y salían. No sabe bajo el cuidado médico que estaba. Que había empleados del hospital, su papá y su madrina, Sandra Casiano. No se acuerda hasta cuando estuvo en el hospital. Que le dio el alta el doctor Pillot, que la bajaron en silla de ruedas, que la montaron en el carro de su papá, que llegó a su casa. Que demanda al doctor Pillot porque no la vio en ningún momento. Que solo [la] vio cuando la dio de alta. Declaró desconocer por que llegó, la llevaron en ambulancia, no recuerda diagnósticos, una doctora estuvo en Sala de Emergencias, no recuerda el nombre.

En el contrainterrogatorio la testigo no recuerda que le hicieron laboratorios, ni que le pusieran medicamentos, desconoce si el doctor Pillot puso órdenes médicas no recuerda que le hicieron un sonograma pélvico, niega que un ginecólogo, doctor Muñiz, fuera a verla. No sabe si el doctor Pillot ordenó el CT Scan de cabeza, ni el MRI de la cabeza. Declaró que hasta el día de hoy, tiene memoria bien corta, se le olvidan las cosas. No conoce los médicos que la visitaron en el cuarto, no recuerda al doctor Méndez, neurólogo, ni que este la evaluara el día 7 de septiembre de 2015, no recuerda si el doctor Pillot la vio el 5 y 6 de septiembre de 2015, ni el examen físico que este le hiciera. Recuerda solo que las enfermeras le chequeaban los sueros, no recuerda medicamentos que le dieron.

Este testimonio de la demandante donde no puede recordar, ni establecerle al Tribunal la intervención o no del Dr. Juan Pillot Costas en su persona, no le mereció ninguna credibilidad al Tribunal sobre los hechos que sucedieron en el Hospital Metropolitano de Yauco los días 2 de septiembre de 2015 al 7 de septiembre de 2015, por no recordar elementos básicos de su estadía en las facilidades hospitalarias, ni la participación de otros médicos en el cuidado médico brindado a esta durante esos cinco (5) días. Este testimonio se descarta por no aportar nada en cuanto a las alegaciones dirigidas en cuanto al demandado, Dr. Pillot Costas.

14. La segunda testigo de la parte demandante fue la Sra. Santia Casiano González quien declaró que Nereida Vargas es sobrina y ahijada. No estuvo en la casa de Nereida cuando esta se sintió enferma, que una vez que sale del hospital porque estaba cuidando a su hermano, que luego falleció, la llamaron y le dijeron que Nereida estaba enferma, que se había desmayado, que estaba sin oxígeno. Fue a casa de ésta y se fue con Nereida en la ambulancia, que la pusieron en Sala de Emergencias por 3 a 4 días, que casi no la iba a ver. Que le hicieron un CT Scan el día que llegaron a las 3:00am. Que estuvo todo el tiempo con ella. Que el papá de Nereida la sustituía de noche. Esta se quedaba de día de 2-3pm. En la mañana no estaba. Que recuerda que no se le hizo nada más allí. De lo sucedido en el cuarto recuerda cuando le dieron de alta. No recuerda ningún otro médico que le diera tratamiento a Nereida.

Que el doctor Pillot fue a darla de alta. Estaba ella, la paciente y el papá. La testigo en su contrainterrogatorio estableció que no estaba en las mañanas, que solo era en las tardes. No recordó la hora a la que llegó el día 7 de septiembre de 2015. No vio al doctor Méndez en el cuarto con la paciente. No recordó un examen médico por el doctor Pillot.

La testigo fue impugnada con su declaración anterior en deposición, página 60 desde la línea 16 sobre el momento en que el doctor Pillot el día 7 de septiembre de 2015 dio de alta a la paciente. Se marcó como Exhibit A de la parte demandada, para fines de impugnación de la testigo, de la deposición tomada a Santia Casiano González, páginas 60 y 61, por ser un testimonio contrario a lo declarado por esta.

A este Tribunal no le mereció credibilidad alguna este testimonio, ya que el testimonio anterior de este testigo contradice su declaración en Sala. Su testimonio está basado en "no recuerdos",

fue una forma vaga e imprecisa y no pudo establecer ninguna de las alegaciones dirigidas contra el Dr. Juan Pillot Costas.

15. El tercer testigo de la parte demandada fue el Sr. Juan Vargas Morales, padre de Nereida Vargas Matos, quien declaró que Nereida se quejaba de noche y que no le dieron medicamentos, solo tenía un suero, que no le pusieron oxígeno a tiempo, que tenía dolor de cabeza, dolor de pecho, que no podía respirar, no podía tragar, ni hablar. Que la subieron al cuarto el día 4 y la dieron de alta el día 7. Que había enfermeras, que Santia Casiano lo sustituía y la cuidaba.

Que demanda al doctor Pillot porque la dio de alta, pero el nunca lo vio en el cuarto de Nereida, ni haciendo nada a Nereida. Que Santia estaba cuando el Dr. Pillot le dio de alta, que nunca antes lo había visto. El Dr. Pillot estaba en el pasillo y le dijeron que la dieron de alta. Que le dieron unas instrucciones, que recogió los papeles, que la llevaron en una silla de ruedas para que yo me la llevara. No me dieron otras instrucciones.

Que él salía del cuarto a buscar comida, café y a dormir en el carro. Que durante el día 7 a las 8:45 am no vio al doctor Méndez, que podía ser que él estuviera en el baño o algo así. No vio al ginecólogo el día 5 y el día 6, no fue con Nereida a que le hiciera un sonograma. No le informaron las enfermeras que ella se negó. En cuanto a los médicos que vieron a la paciente el día 4, a las 10:25, él no estaba allí en el acto. Ni tampoco vio al médico que vio a la paciente el 5 de septiembre de 2015, a las 11:20am, este indicó que no estaba allí en el cuarto. Ni a un médico que viera a la paciente el día 6 de septiembre de 2015, a las 2:20 pm, este indica que no lo vio. No vio al doctor Pillot Costas el día 7 de septiembre de 2015, a las 11:00 am.

En el redirecto, este declaró que Nereida se cayó, que él no estaba en el cuarto. La muchacha se cayó de la cama, se lo dijo la paciente de al lado. El día 7 de septiembre de 2015, él no estaba en el cuarto, solo vio al Dr. Juan Pillot Costas en el pasillo.

El testimonio del demandante, Juan Vargas tampoco le mereció credibilidad a este Tribunal por su contestación evasiva y en ocasiones hasta estereotipada, plagada de no conocer, no estar, no recordar. Fue una declaración carente de evidencia en cuanto a sostener las alegaciones de la demanda en contra del Dr. Juan Pillot Costas, por eso se descarta.

16. El cuarto testigo de la parte demandante fue el Dr. Hector S. Miranda Delgado, neurólogo, quien quedó cualificado como perito en neurología, que examinó varios récords médicos pero que algunos no estaban completos y así emitió su opinión.

De su informe pericial escrito fueron eliminadas las referencias médicas 2, 3, 5 y 7 por no estar relacionadas con la controversia a dirimir por este Tribunal en cuanto al Dr. Juan Pillot Costas.

Declaró que la paciente Nereida Vargas llegó al Hospital Metropolitano de Yauco en ambulancia, que fue recogida en su casa a las 11:40 pm el 2 de septiembre de 2015. Que presentaba síntomas de ansiedad, desorientación que habían comenzado ese día. En la Sala de Emergencias se le hicieron pruebas básicas de cernimiento, CT de cabeza, que la lectura fue negativa. Que estuvo en Sala de Emergencias los días 3 y 4 hasta las 3:45 pm hasta que fue admitida al servicio del Dr. Juan Pillot Costas.

Estaba disponible un CT de cabeza que estaba sin hallazgos anormales. Un CT con y sin contraste del 4 de septiembre de 2015, a las 11:28 am realizado por vértigo, sincope y lado izquierdo con hemiparesis y que demostraba un infarto agudo en el lado derecho MCA. No hay evidencia aguda intracraneal. El manejo para este infarto (stroke) hemorrágico, isquémico, que algo tapa el vaso sanguíneo, había que descartar que no haya sangre fuera de los vasos.

El manejo médico es evitar que el evento sea mayor. Se dieron las siguientes órdenes de admisión por el Dr. Juan Pillot Costas. Chequeo de vitales cada 4 horas, IV fluids, Lovenox 60 mg subcutáneo (es un antiplaquetario), hacer un 2d echo, evaluación de las carótidas, brain MRI w/o con contraste.

El doctor Miranda como neurólogo hubiera añadido un antiplaquetario para evitar el progreso y/o un segundo evento. El día 5 de septiembre de 2015, a las 10:40 se le añadió Plavix. A ese momento hacía 58 horas que llegó a Sala de Emergencias. Que el día 7 de septiembre de 2015 se hizo un CT Scan sin contraste, que demostró un área hipodensa, que no había sangre, que se extiende hacia el ganglio nasal, que es más prominente que en el CT del 4 de septiembre de 2015. Esta es una lesión que se conocía, que había un desplazamiento de la línea media de 4mm hacia el lado izquierdo, para él como neurólogo es algo que está creciendo y empujando. Se realizó un MRI y un examen de carótidas. El MRI demostró infarto agudo en el lado temporal al lado parietal. El Dr. Samuel Méndez, neurólogo, contestó la consulta del 7 de septiembre de 2015, a las 8:49 am. Emite una serie de recomendaciones, que se hidrate, presiones controladas, y se realice holter, 2d echo, doppler de carótidas, TSH, Vitamina D, ácido fólico, profile de lípidos, proteína S y C. Que se le administre aspirina, m[u]ltivitaminas y Lenovox, con excepción del profile de lípidos y proteínas S y C, ya todas las demás pruebas estaban realizadas.

La paciente se dio de alta luego de la evaluación por un neurólogo, a las 11:00am por el Dr. Juan Pillot Costas, se le recetó Plavix 75 mg y Sinbastatin (Zocor) y se le dio referido para evaluación neurológica como paciente ambulatorio, además de su visita en una semana con el Dr. Juan Pillot Costas en su oficina. En su opinión señaló que el no dar Plavix hasta 20 horas después de la admisión, que provocó un aumento del tamaño del accidente cerebrovascular, y la posible ocurrencia de un segundo accidente cerebrovascular.

Que las recomendaciones del doctor Méndez, neurólogo, no eran para el diagnóstico, eran para determinar la etiología, la razón del accidente cerebrovascular que ocurrió el 2 de septiembre de 2015 en su casa. Que erró el doctor Pillot al no seguir las recomendaciones, ya que la etiología o causa podría evitar que volviera a ocurrir y/o prevenirse.

Del alegado segundo accidente cerebrovascular no tenía récord completo, pero declaró que un mes después tuvo un evento parecido, similar al del 2 de septiembre de 2015. Que luego de evaluar el récord del Hospital de La Concepción del 6 de octubre de 2015 al 21 de octubre de 2015 (Exhibit IV por estipulación) no está claro la etiología, porque las pruebas realizadas allí, todas fueron negativas.

En su contrainterrogatorio aceptó que las pruebas fueron negativas, que fue vista por el neurólogo, el doctor Berríos, el día antes de que la paciente llegara a Sala de Emergencias del Hospital La Concepción, que el doctor Berrios continuó con el tratamiento médico de Plavix que había ordenado el Dr. Juan Pillot Costas.

Confrontado con el Exhibit IV por estipulación, récord del Hospital La Concepción, aceptó que no hubo un segundo accidente cerebrovascular en la admisión del Hospital La Concepción. No hubo una ocurrencia de un segundo evento.

17. Sometido el caso por la parte demandante, la parte demandada presentó como su primer testigo, a su perito Dr. José Carlo Izquierdo, neurólogo.

Se marcó como Exhibit B de la parte demandada, el Curriculum Vitae del doctor Carlo sin oposición de la parte demandada, así como el informe pericial como el Exhibit C y la literatura médica que se acompañó quedó marcada como Exhibit D (1), (2), (3), (4) y (5).

El doctor Carlo declaró que el día 2 de septiembre de 2015 la Sra. Nereida Vargas Matos de 25 años de edad y quien había dado a luz a un hijo el 20 de agosto de 2015, acude transportada en ambulancia a la Sala de Emergencias del Hospital Metropolitano Dr. Tito Mattei, en Yauco, Puerto Rico (HM) con evaluación inicial a las 11:29 PM, con queja principal listada [*sic]* en el expediente, de vómitos, síncope, y cefalea. Que en su revisión de los expedientes, se encontró una divergencia en cuanto al historial de queja principal, indicándose en la hoja de transporte de ambulancia que la paciente sufrió un desmayo seguido de un vómito; y en hoja de evaluación médica inicial en Sala de Emergencias (ER) la queja fue de ansiedad y desorientación desde hoy ("anxiety and disorientation since today"). En esta evaluación inicial se describe el examen general sin observaciones de anormalidad y se lista estado mental alterado como el diagnóstico inicial. El médico de Sala de Emergencias procede a ordenar Tomografía Computarizada (CT) cerebral, laboratorios, placa de pecho, y administrarle a la paciente los medicamentos Lorazepam (Ativan), Benadryl, y Haloperidol (Haldol). Según notas de enfermería, la Sra. Vargas permanece dormida durante las próximas horas de su estadía en la Sala de Emergencias. El CT obtenido se reportó como normal.

Que en la mañana del día 4 de septiembre de 2015 se reporta a la paciente como letárgica y se obtiene un segundo CT cerebral con y sin contraste, el cual se reporta con evidencia de infarto cerebral isquémico en el territorio de la arteria cerebral media (MCA) derecha. Se consulta al Dr. Juan Pillot, médico con especialidad en Medicina de Familia, quien admite para hospitalización a la Sra. Vargas el día 4 de septiembre, a las 3:45 pm. En el historial obtenido mediante entrevista al padre de la Sra. Vargas, se indica que la paciente fue traída a hospital con queja de debilidad del lado izquierdo del cuerpo luego de desarrollar movimientos tipo "convulsión" en su casa. Entre sus órdenes médicas, el Dr. Pillot están telemetría cardiaca, ecocardiograma, estudios no invasivos de carótidas y arterias vertebro-basilares, resonancia magnética (MRI) del cerebro, electrocardiograma, placa de pecho, laboratorios múltiples, PR, PTT, "Sed Rate", consulta a neurología (Dr. Méndez), consulta con el Dr. Muñiz ginecólogo, sonografía abdomino-pélvica y endo-vaginal, y le ordena medicamentos "Lovenox, y el anti-plaquetario "Plavix". La paciente continua estable y es dada de alta el día 7 de septiembre de 2015 en el medicamento anti-plaquetario Plavix y un referido para ver a un neurólogo como paciente ambulatorio. De hecho, el día 5 de octubre de 2015, la Sra. Vargas es evaluada por el neurólogo Dr. Carlos Berríos, quien la continua en el medicamento Plavix, según recetado por el Dr. Pillot.

Que el día 6 de octubre de 2015, un mes más tarde, luego del alta del Dr. Juan Pillot Costas, la paciente fue admitida con quejas de cambios neurológicos y sospecha de un segundo infarto cerebral al Hospital de la Concepción en San Germán. En esta institución, a la paciente se le realizaron estudios de imagen que mostraron lesión en el hemisferio derecho sin describirse infarto agudo cerebral en la interpretación de dichos estudios. Sin embargo, en su interpretación de la imagen, el radiólogo describe la posibilidad de una malignidad cerebral. Como parte de su evaluación, se consultó al Dr. Lameiro, neurocirujano, y se le realizaron estudios de imagen posteriores a la paciente incluyendo MRI con y sin contraste. También se le realizaron a la paciente estudios de coagulación, y anticuerpos antifosfolípidos incluyendo "Lupus anti-coagulant", Proteína S, Proteína C, anticardiolipinas, antitrombina III, y otros. Todos estos estudios relacionados al proceso de coagulación tuvieron resultados negativos, estaban normales. Según se interpreta del expediente, se descartó la malignidad cerebral y se confirmó el diagnóstico de infarto cerebral del hemisferio derecho previo, no se diagnosticó un segundo evento cerebro vascular. La paciente fue dada de alta el día 21-10-15 de dicha institución.

Que la Sra. Vargas continuó seguimiento y tratamiento médico con el Dr. Carlos Berríos, neurólogo por varios meses. Surge de la

revisión del expediente de la oficina del Dr. Berrios que meses después del alta del Hospital de la Concepción se llegó al diagnóstico del "síndrome de anti-fosfolipidos" basado en el hallazgo de la presencia del anti-cuerpo "Lupus anti-coagulant". Este laboratorio había resultado normal cuando se ordenó durante la estadía de la Sra. Vargas en el Hospital la Concepción. Por un tiempo, la paciente recibió tratamiento con agente anticoagulante (Coumadin-Warfarina) luego resumiendo tratamiento con antiplaquetario Plavix.

Que según las guías para el tratamiento de infarto isquémico cerebral agudo, emitidas en el 2013 y adoptadas por la comunidad médica, se recomienda tratamiento con agentes anti-plaquetarios (como Aspirina o "Plavix") en un periodo de 24 a 48 horas luego del evento (Referida 1, 2). Cabe señalar que estas *Guias*, como otras, descansan en el juicio médico aplicable a cada paciente y su aplicabilidad depende de la situación particular de cada caso.

Concluyó el doctor Carlo que el doctor Pillot actuó adecuadamente ordenando el medicamento "Plavix" dentro de ese espacio de tiempo luego de su admisión y posterior a estudios de imagen que determinaron que la paciente había tenido un infarto cerebral "agudo" (reciente) según recomendado por las guías del 2013 aplicables a su intervención con la señora Vargas en el año 2015. Así mismo, no vio ninguna consecuencia que se pueda evidenciar en el expediente por la alegada dilación en comenzar el agente antiplaquetario en la paciente.

Declaró el doctor Carlo que aproximadamente un mes después, admitida en el Hospital de la Concepción, se le realizaron a la Sra. Vargas todos los estudios de coagulación recomendados por el doctor Méndez y otros estudios de coagulación adicionales, incluyendo estudios para identificar el "síndrome de anti-fosfolípidos: y el estudio de "Lupus Anti-Coagulant". Dichos estudios, resultaron normales (negativos) y no alteraron de ninguna forma el manejo de la paciente, ya que al ser normales no aportaron al diagnóstico ni variaron el tratamiento médico que esta tenía que seguir.

Que correctamente, el Dr. Pillot en su alta de la Sra. Vargas, la refirió a un seguimiento por un neurólogo y le prescribió el medicamento Plavix. Que el día 5 de octubre de 2015, el Dr. Berrios, neurólogo, evaluó a la Sra. Vargas y la continuó con el medicamento Plavix que había recetado el doctor Pillot Costas.

Declaró y se sostuvo en que el manejo médico brindado por el doctor Pillot Costas del 4 al 7 de septiembre de 2015 en el Hospital Tito Mattei de Yauco, este no se apartó de la mejor practica médica.

18. Continuó la presentación de la prueba de la parte demandada con el testimonio del demandado, Dr. Juan Pillot Costas. Este declaró que desde el 1988 con una especialidad en Medicina de Familia desde el 1994, la cual práctica hasta el presente.

Que ha mantenido una oficina privada en Guayanilla.

Que ha tenido y tiene privilegios de hospitalización en Medicina de Familia en el Hospital Dr. Pila de Ponce y en el Hospital Tito Mattei de Yauco. Declaró que para ser los médicos hospitalistas hay un roster de guardias. Que se le llamó por el médico de la Sala de Emergencias para presentarme el caso de la paciente, Nereida Vargas.

Posterior al alta en la paciente el 7 de septiembre de 2015 no tuvo ningún contacto con la paciente.

El médico de Sala de Emergencias lo llama para presentarle el caso de esta paciente, le explicó lo ocurrido con ella y le pidió su opinión en cuanto a la admisión del paciente.

Se examinó el récord médico del Hospital Tito Mattei de Yauco (Exhibit I por estipulación) con el doctor Pillot Costas y se recoge lo que constituye su intervención con esta.

Las órdenes de admisión las recogió el médico de Sala de Emergencias dadas por el doctor Pillot Costas, telefónicamente, ya que este no está en la institución, se le presentó el caso por teléfono, y las ordenes son para que se pueda hacer la admisión de forma inmediata. Estas fueron:

Que se admitiera al servicio del doctor Pillot a un ward de condición de cuidado, tomar los vitales cada 4 horas, suero de solución salina al 0.9%, Lovenox subcutáneo, realizar un 2d echo (estudio cardiovascular), ecocardiograma para la función del corazón y válvulas y la situación del corazón, un Doppler de las carótidas, brain MRI sin contraste, placa de pecho, EKG, PT, PTT (laboratorios para evaluar la coagulación). Laboratorios de sed rate para medir los procesos inflamatorios. Consulta con el doctor Méndez, neurólogo, catéter folley #16. Que le notificaran cuando la paciente llegara a piso.

El Dr. Juan Pillot Costas vio a la paciente el 5 de septiembre de 2015, a las 10:45 am.

El médico interno que rota con el doctor Pillot en su rotación de Medicina de Familia y de Medicina Interna es quien redacta el documento de historial y físico de Admisión que se hizo el 4 de septiembre de 2015, a las 3:45 pm. El Médico Interno puede hacer esto bajo la supervisión del doctor Pillot, tanto notas de progreso, como evaluar pacientes, y hace recogido y entrega de guardias. El horario de los internos es de 24 horas y 7 [días] a la semana. El Dr. Juan Pillot Costas declaró que él pasa visita a los pacientes en la mañana.

El contenido del historial y físico de admisión (páginas 5, 6, 7 y 8 del Exhibit I por estipulación) quien lo preparó fue el médico interno. En la preparación de este documento, incluye la información que le da la paciente, se revisan los hallazgos, la queja y los resultados de los laboratorios disponibles a ese momento, se hace el examen físico.

Cuando ambos médicos fueron a evaluar la paciente, en la mañana del día 5 de septiembre de 20[15], había un familiar con esta.

En la página 9 está la consulta del doctor Méndez, que el doctor Pillot solicitó, y la contestó el doctor Méndez el día 7 de septiembre de 2015.

La nota de progreso de la admisión (páginas del Exhibit I por estipulación número 42, 43, 44) la escribió el Médico Interno que rota con el Dr. Juan Pillot Costas, la doctora Rosado y el examen físico lo hizo el 4 de septiembre de 2022, a las 3:45 pm, la doctora Rosado. Eso fue cuando la paciente llegó al piso.

La nota de progreso (página 48), quien lo escribió 9/5/15 a las 11:20 am, fue el Médico Interno que rota con este.

En la página 62 están las órdenes: 9/4/2015, a las 10:08 pm dadas por el doctor Pillot Costas telefónicamente: Telemetría ahora, radiografía de cabeza ahora, TSH (prueba de tiroides), consulta al doctor Muñiz (ob-gy[n]) y obtener resultado de MRI de cabeza hecho.

Se le había notificado que la paciente se había caído de la cama, se lo notificaron y dio órdenes de: monitoreo continuo de telemetría y radiografía de huesos de la cabeza.

En la página 62, el 9/4/2015, a las 11:03 pm se coloca la orden de Acetaminophen para el dolor de cabeza y Benadryl, órdenes telefónicas del doctor Pillot Costas.

En la página 62, el 9/5/2015, a la 1:46 am surge en las órdenes de colocar cánula de oxígeno, medidas de oxímetro para verificar su oxigenación continua.

En la página 64, son órdenes escritas por el Dr. Juan Pillot Costas el 9/5/2015, a las 10:40 am: CBC con diferencial, BMP en la mañana, Plavix 75mg diaria, MRI de cabeza sin contraste y consulta al Dr. Méndez, neurólogo.

Se le puso una consulta al doctor Muñiz, obstetra-ginecólogo, por haber tenido un bebé hacía dos semanas atrás, y para que relacionara si el evento de stroke estuvo relacionado con el proceso postparto.

Se escribió por segunda vez la consulta al doctor Méndez, neurólogo por que éste no había venido a evaluar la paciente.

El resultado del MRI de cabeza que se obtuviera, se le ordenó a el 9/4/2015, a las 3:45 pm.

El doctor Muñiz, obstetra- ginecólogo ordenó un sonograma vaginal.

El 9/5/2015, a las 9:50 pm se le ordena Phenergan 50 mg IV cada 8 horas por el doctor Pillot Costas en orden telefónica.

El 9/6/2015, a las 11:35 am, luego de ver la paciente se escriben órdenes por el doctor Pillot Costas donde vuelven a pedir el reporte del MRI de cabeza y el reporte del 2d echo y pide una evaluación por Terapia física.

En la página 48 del 9/5/2015, a las 11:20 am surge una nota de progreso escrita por el Médico Interno. Luego de que el doctor Pillot y el interno hacen el examen físico a la paciente, se encontró que se quejaba de dolor de cabeza, que se sentía regular, los signos vitales estaban estables, estaba orientada en tiempo y espacio. En el examen físico encontraron desviación de la comisura labial del lado derecho. Abdomen sonidos peristálticos presentes, en extremidades había disminución de la fuerza del lado izquierdo, no así en el lado derecho. En el examen neurológico encontró déficit del lado izquierdo con deficiencia motora de ese lado. Se hace un diagnóstico CVA (accidente cerebro vascular), depresión y asma.

En el avaluó se documentó: paciente de 25 años con diagnósticos que reflejan dolor de cabeza antes señalados, refiere dolor de cabeza y ansiedad por su condición, en tratamiento y medidas de soporte, sin ninguna complicación.

La paciente tiene una consulta puesta con el grupo de neurología y de ginecología. Se le explicó extensamente a la paciente y familiares.

En la página 52, a las 2:20 pm del día 9/6/2015, la nota de progreso la escribe el Médico Interno, el examen físico se hace por ambos médicos. Se encontró el examen físico que se siente regular, signos vitales estables, normales, despierta, alerta y orientada por 3, acompañada de familiar. Declaró el doctor Pillot Costas que regularmente estaba el papá con ella. Se documentó desviación de la comisura labial del lado derecho. Disminución en la fuerza y sensación del lado izquierdo disminuida pero no del lado derecho. Se revisan los laboratorios y se documentan.

De la evaluación neurológica se documenta déficit focal del lado izquierdo. Esto es que a su lado izquierdo tiene hemiparesis, disminución de la fuerza y sensación.

En la página 66 surgen las órdenes telefónicas del doctor Pillot del 9/6/2015, a las 5:25 pm de Troponinas, CPK-MB, CPK total, se le repitió un EKG, se hicieron gases anteriales. A las 6:09 pm hay otra orden telefónica del doctor Pillot Costas de repetir el CT Scan de la cabeza sin contraste. Se le ordena Simvastatin de 40 por boca diaria, es una estima que se utiliza en pacientes con

eventos cerebro vascular, es para evitar la formación de trombos por el colesterol.

El día 6, el doctor Méndez no había contestado la consulta aún.

En la página 9 del 9/7/2015, a las 8:49 am, el doctor Méndez, neurólogo, habló con este en el counter del piso sobre los hallazgos, recomendaciones y disposición del alta de la paciente ese día para el manejo ambulatorio y referido neurólogo.

En la página 66, a las 8:55, el doctor Méndez escribe la orden de una evaluación por terapia física.

En la página 67, está la orden del alta y descontinuar líquidos. Declaró el doctor Pillot Costas hace la orden del alta, luego de hablar con el doctor Méndez, con la paciente, y con los familiares que [*sic*] estaban con la paciente. Se le explicó todo lo que iban a hacer para tratar la condición de la paciente ambulatoriamente.

Se le explica a la paciente y al familiar que está con ella que se va de alta, se dan recomendaciones. Que vaya al médico de cabecera para que le den el referido al neurólogo y al fisiatra. Se le da una copia del CT Scan para que se lo lleve al médico de cabecera y al neurólogo.

En la página 122 hay una receta escrita de los medicamentos que va a tomar hasta que fuera donde el neurólogo. Plavix 75 mg una diaria por 30 días, Sim[v]astatin 2 g diaria por 30 días. Nunca más volvió a saber de la paciente hasta que recibió la demanda.

19. El día 5 de abril de 2022 declaró el Dr. Samuel Méndez, testigo del demandado, Dr. Juan Pillot Costas. Este declaró que fue consultado por el doctor Pillot Costas, que evaluó la paciente el día 7 de septiembre de 2015 en la habitación del hospital, que revisó todos los laboratorios y pruebas realizadas a la paciente en este momento, que emitió unas recomendaciones al médico que puso la consulta. Que encontró a la paciente neurológicamente estable, que no había ningún compromiso, que podía ser dada de alta para continuar tratamiento y evaluación ambulatoriamente y que estaba de acuerdo con el diagnostico dado de infarto cerebral isquémico del área media. Que discutió sus hallazgos, diagnósticos y recomendaciones con el doctor Pillot Costas en el área médica del piso donde se encontraba el paciente.

Inconforme, el 14 de noviembre de 2022, la parte apelante acudió ante esta Curia, mediante el presente recurso de apelación, señalando los siguientes errores:

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR QUE LA CAUSA DE ACCIÓN PRESCRIBIÓ INTERRUMPIDO EL TÉRMINO PRESCRIPTIVO POR MEDIO [DE] ESCRITO TITULADO "NOTIFICACIÓN Y RECLAMACIÓN EXTRAJUDICIAL"[,] NOTIFICADO POR CORREO CERTIFICADO EL 31 DE AGOSTO DE 2016 Y RECIBIDO EL 2 DE SEPTIEMBRE DE[L] MISMO AÑO POR EL DR. JUAN PILLOT COSTAS.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DESESTIMAR [Y] CONCLUIR QUE EL DR. JUAN PILLOT COSTAS NO ACTUÓ NEGLIGENTEMENTE EN EL TRATAMIENTO MÉDICO BRINDADO A LA PACIENTE NEREIDA VARGAS MATOS, A PESAR DE ESTABLECERSE QUE NO ACTUÓ CONFORME A LAS GUÍAS PARA EL TRATAMIENTO DE INFARTO ISQUÉMICO CEREBRAL

AGUDO, EMITIDAS EN EL 2013 Y ADOPTADAS POR LA COMUNIDAD MÉDICA, DONDE SE RECOMIENDA TRATAMIENTO CON AGENTES ANTI-PLAQUETARIOS (COMO ASPIRINA O "PLAVIX") EN UN PER[I]ODO DE 24 A 48 HORAS LUEGO DE UN EVENTO.

El 6 de julio de 2023, la parte apelada compareció mediante *Alegato de la Parte Demandada en Oposición a la Apelación y Solicitud de Desestimación de Apelación.* En síntesis, alegó que no se cometió el primer error planteado, toda vez que el foro de instancia no dictó sentencia desestimatoria por prescripción. De igual forma, planteó que la parte apelante no aportó la evidencia necesaria para probar que el galeno incurrió en negligencia en el tratamiento médico de Vargas Matos. Por lo tanto, entendía que no se podía dejar sin efecto una sentencia cuyas conclusiones se encontraban en completo apoyo de la prueba desfilada, tanto en récords médicos, informes periciales y literatura médica. Por lo antes expuesto, sostuvo que debía confirmarse el dictamen apelado.

Luego de varias incidencias procesales, y estipulada la transcripción de la prueba oral, el 28 de septiembre de 2023, la parte apelante presentó un *Alegato Suplementario de la Parte Apelante.* Esta vez, proveyó como prueba de que el foro de instancia erró al determinar que hubo prescripción de la causa de acción el comunicado enviado al Dr. Pillot Costas titulado *"Notificación y Reclamación Extrajudicial".* De igual forma, reiteró que el foro de instancia incidió al concluir que el Dr. Pillot Costas no actuó negligentemente en el tratamiento médico brindado a la paciente Vargas Matos. Ello, según adujo, a pesar de establecerse que el galeno no actuó conforme a las guías para el tratamiento de infarto isquémico cerebral agudo, emitidas en el año 2013 y adoptadas por la comunidad médica, donde se recomienda el tratamiento con agentes antiplaquetarios en un periodo de 24 a 48 horas luego de un evento.

El 12 de octubre de 2023, la parte apelada presentó un *Alegato de la Parte Demandada-Apelada en Oposición al Alegato Suplementario de la Parte Demandante-Apelante.* En esencia, alegó que no existe en la *Sentencia* del foro de instancia una conclusión de derecho, ni disposición del caso, sobre el aspecto de prescripción, ni se dictó sentencia desestimatoria por estar prescrita la causa de acción de los apelantes. Argumentó que el error planteado por la parte sobre una sentencia desestimatoria no se cometió. Por otro lado, en cuanto al segundo error sobre negligencia, reiteró que los apelantes no aportaron la evidencia necesaria para probar que el Dr. Pillot Costas incurrió en negligencia en el tratamiento médico de Vargas Matos. Por lo tanto, sostuvo que este Foro apelativo no podía dejar sin efecto una *Sentencia* cuyas conclusiones se encontraban en completo apoyo de la prueba desfilada, tanto en los récords médicos, el informe pericial del Dr. José Carlo Izquierdo y la literatura médica aportada por este.

Con el beneficio de la comparecencia de las partes, así como con la transcripción de la prueba oral, procedemos a resolver.

**II**

**A**

La prescripción de las acciones es un asunto de derecho sustantivo, no procesal, que persigue "evitar la incertidumbre de las relaciones jurídicas y castigar la inacción en el ejercicio de los derechos". *García Pérez v. Corp. Serv. Mujer,* 174 DPR 138, 147 (2008). Conforme el Artículo 1861 del Código Civil de 1930,[10] 31 LPRA sec. 5291, "[l]as acciones prescriben por el mero lapso del tiempo fijado por la ley".[11] Por su parte, el Artículo 1869 del Código

---

[10] El derecho aplicable en el caso de autos se remite al Código Civil de Puerto Rico de 1930, 31 LPRA sec. 1 *et seq.* (derogado), toda vez que nos encontramos ante hechos ocurridos con anterioridad a la aprobación y vigencia del Código Civil de Puerto Rico de 2020, Ley Núm. 55-2020, 31 LPRA sec. 5311 *et seq.*
[11] Véase, nota al calce núm. 5.

Civil, 31 LPRA sec. 5299, dispone que, de no existir una disposición especial que determine otra cosa, el tiempo para la prescripción de toda clase de acciones se contará desde el día en que se pudo ejercitar. En el caso particular de las acciones, al amparo del Artículo 1802 del Código Civil de 1930, *supra*, estas prescriben por el transcurso de un (1) año desde que lo supo la persona agraviada. La teoría cognoscitiva del daño dispone que el término prescriptivo comienza a correr desde que la persona agraviada: (1) del daño o desde que razonablemente debió conocerlo; (2) quién fue la persona autora; y (3) los elementos necesarios para ejercitar efectivamente la causa de acción. *Toro Rivera et als. v. ELA, et al.* 194 DPR 393, 416 (2015).

Por otra parte, el Código Civil de Puerto Rico disponía en el Artículo 1830, 31 LPRA sec. 5241, de dos tipos de prescripción, a saber: la adquisitiva y la extintiva. La prescripción extintiva es sustantiva y se reconoce como "una de las formas establecidas en el Código Civil para la extinción de las obligaciones". *Santos de García v. Banco Popular*, 172 DPR 759, 766 (2007). La prescripción extintiva se configura bajo los siguientes requisitos: (1) la existencia de un derecho que se pueda ejercitar; (2) la falta de ejercicio o inercia por parte del titular del mismo; y (3) el transcurso del tiempo determinado en ley, sin que se haya ejercido el derecho o interrumpido de forma eficaz y oportuna. *Santos de García v. Banco Popular*, supra, pág. 766.

En cuanto a esta defensa afirmativa, nuestro Tribunal Supremo resolvió en *Meléndez v. El Vocero de Puerto Rico,* 144 DPR 389, 399 (1997), que:

> "Como se sabe, la prescripción es una defensa afirmativa. Por ello, no se debe esperar por años, luego de que se ha entablado un procedimiento judicial, para posteriormente sorprender con ella a todos, una vez se acerque la fecha de la vista del caso. Una defensa afirmativa que no es presentada a tiempo se considera renunciada,

salvo que se demuestre que no se le omitió por falta de diligencia, no siendo esto último lo usual. Si la parte demandada entendía que la prescripción se consumó luego de contestarse la demanda, debió haberlo señalado con premura, en la primera oportunidad que tuvo para plantearlo, sin esperar a que se agotara el descubrimiento de prueba. (Citas omitidas).

**B**

Existen tres maneras de interrumpir un término prescriptivo: (1) mediante la presentación de la acción judicial correspondiente; (2) por una reclamación extrajudicial; y (3) por el reconocimiento de la deuda por la parte deudora, 31 LPRA sec. 5303. En particular, para que una reclamación extrajudicial logre tener un efecto interruptor, lo esencial es que la reclamación sea una 'manifestación inequívoca de qui[e]n, amenazado con la pérdida de su derecho, expresa su voluntad de no perderlo'". *Cacho González et al. v. Santarrosa et al.*, 203 DPR 215, 228 (2019), citando a *Feliciano v. A.A.A.*, 93 DPR 655, 660 (1966).

Nuestro ordenamiento jurídico no exige una forma específica para interrumpir la prescripción de forma extrajudicial. No obstante, se han señalado ciertos requisitos que debe cumplir una reclamación extrajudicial para que opere una interrupción de la prescripción: (1) la reclamación debe ser oportuna, lo cual requiere que se realice antes de la consumación del plazo; (2) la reclamación debe ser hecha por el titular del derecho o acción cuya prescripción se quiere interrumpir; (3) se requiere idoneidad del medio utilizado para realizar la reclamación; y (4) debe existir identidad entre el derecho reclamado y aquella persona afectada por la prescripción. *Díaz Santiago v. International Textiles*, 195 DPR 862, 870 (2016); *Pereira Suárez v. Jta. Dir. Cond.*, 182 DPR 485, 505-506 (2011). En resumen, la reclamación extrajudicial puede plasmarse a través de distintos actos, pero todos ellos han de cumplir con los requisitos genéricos de oportunidad, identidad,

legitimación e idoneidad antes reseñados. *Pereira Suárez v. Jta. Dir. Cond.*, supra, pág. 506.

En cuanto a la reclamación extrajudicial hecha por medio de una carta, se interrumpe la prescripción de la acción si esta llega a su destino. Al respecto, la Regla 304 (23) de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 304 (23), que establece que "[u]na carta dirigida y cursada por correo debidamente, fue recibida en su oportunidad". Sin embargo, para activar la presunción establecida en la citada regla, se debe demostrar que, en efecto, se envió la carta. Una vez establecido el hecho básico de que la carta se envió, corresponde a la otra parte presentar prueba para persuadir al juzgador de la inexistencia del hecho presumido de que las cartas llegaron a su destino. *CSMPR v. Carlo Marrero et als.*, 182 DPR 411, 429-430 (2011).

## C

Los actos y omisiones en que intervenga cualquier género de culpa o negligencia son fuentes de obligaciones que general responsabilidad civil extracontractual. 31 LPRA sec. 2992. Por ello, el Artículo 1803 del Código Civil de Puerto Rico de 1930 establece que, "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado [...]". 31 LPRA sec. 5141. La responsabilidad civil al amparo de esta norma requiere la concurrencia de tres elementos, a saber: (1) la ocurrencia de un daño; (2) que dicho daño hubiera surgido como resultado de un acto u omisión culposa o negligente del demandado y (3) la existencia de un nexo causal entre el daño sufrido y dicho acto u omisión. *Nieves Díaz v. González Massas*, 178 DPR 820, 843 (2010); *López v. Porrata Doria*, 169 DPR 135, 150 (2006). Las acciones por responsabilidad civil extracontractual "se distinguen porque la responsabilidad frente al perjudicado surge sin que le preceda una relación jurídica entre las partes".

*Maderas Tratadas v. Sun Alliance et al.,* 185 DPR 880, 908 (2012). En estos casos, la culpa o negligencia consiste en la falta de cuidado al no anticipar o prever las consecuencias de un acto, tal y como lo haría una persona prudente y razonable en iguales circunstancias. *Montalvo v. Cruz,* 144 DPR 748, 755–756 (1998). Siendo ello así, la norma exige que se actúe con el grado de cuidado, diligencia, vigilancia y precaución que las particularidades del asunto de que trate exijan. *Monllor v. Soc. de Gananciales,* 138 DPR 600, 604 (1995).

En *Rodríguez et al. v. Hospital et. al.*, 186 DPR 889, 900 (2016), se reiteró y recalcó que una acción para exigir responsabilidad profesional a un médico no es distinta a la de un caso ordinario de daños y perjuicios por negligencia al amparo del Artículo 1802 del Código Civil, *supra.* Por lo tanto, al igual que cualquier otra causa de acción por daños y perjuicios, la reclamación por impericia médica requiere que la parte demandante establezca por preponderancia de la evidencia, creída por el juzgador, que los actos de negligencia, falta de cuidado o impericia del médico causaron el daño reclamado. *Íd.*

En los casos de impericia médica es necesario que el promovente de la acción demuestre la ocurrencia de un acto médico culposo o negligente, la producción de un daño real y la relación causal entre el acto del médico y el daño sufrido. *Soto Cabral v ELA,* 138 DPR 298, 308-309 (1995). De modo que le corresponde al demandante probar, mediante preponderancia de la prueba, que las acciones negligentes del médico fueron el factor que con mayor probabilidad ocasionó el daño sufrido y establecer el vínculo causal requerido por el Artículo 1802 del Código Civil de Puerto Rico, *supra. Castro Ortiz v. Mun. de Carolina,* 134 DPR 783, 793 (1993); *Torres Ortiz v. Plá,* 123 DPR 637 (1989); *Rodríguez Crespo v. Hernández,* 121 DPR 639, 650 (1988).

Sin embargo, en nuestra jurisdicción rige una presunción a favor del médico que sugiere que este haya observado un grado razonable de cuidado y atención en la administración del tratamiento médico y que los exámenes practicados al paciente hayan sido adecuados. Por ello, le corresponde a la parte demandante controvertir esta presunción con prueba que demuestre algo más que una mera posibilidad de que el daño se debió al incumplimiento del médico de su obligación profesional. La relación de causalidad no se puede establecer a base de una mera especulación o conjetura. *López v. Dr. Cañizares,* 163 DPR 119, 134-135 (2004); *Blás v. Hosp, Guadalupe,* 146 DPR 267, 324 (1998). *Santiago Otero v. Méndez,* 135 DPR 540, 549 (1994).

Al evaluar esta prueba, el tribunal debe considerar que en nuestro ordenamiento jurídico las normas mínimas de cuidado, conocimiento y destrezas que le son requeridas a los profesionales de la salud, en casos de alegada mala práctica profesional, son las de brindar a sus pacientes aquella atención que, "a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, satisface las exigencias profesionales generalmente reconocidas por la profesión médica". *López v. Dr. Cañizares*, supra, pág. 133; *Santiago Otero v. Méndez*, supra.

Hay que tener presente que la negligencia del médico no se presume por el hecho de que el paciente haya sufrido un daño o que el tratamiento no haya sido exitoso. *López v. Dr. Cañizares,* supra; *Rodríguez Crespo v. Hernández,* supra, pág. 650. Se ha dicho al respecto que, para establecer un caso prima facie de impericia médica se tiene que presentar prueba sobre: 1) las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o a los especialistas, 2) demostrar que el demandado incumplió con estas normas en el tratamiento del

paciente; y (3) demostrar que ésta fue la causa de la lesión sufrida por el paciente. *Arrieta v. De la Vega*, 165 DPR 538 (2005); *Medina Santiago v. Vélez*, 120 DPR 380, 385 (1988*); Rodríguez Crespo v. Hernández*, supra, pág. 650.

Lo anterior quiere decir que le corresponde al demandante establecer, mediante prueba pericial, cuáles son los requisitos de cuidado y conocimiento científico requeridos por la profesión en un tratamiento determinado, las normas de conocimiento informado y la razón por la cual el médico demandado no cumplió con las mismas. *Rodríguez Crespo v. Hernández*, supra, págs. 650-651; *Medina Santiago v. Vélez*, supra, pág. 385. Conforme a la norma antes indicada, el médico solamente responde por los daños y perjuicios causados cuando actúa negligentemente, con descuido o cuando falta a la pericia profesional que exigen las circunstancias. *Ríos Ruiz v. Mark*, 119 DPR 816, 820 (1987); *López v. Dr. Cañizares*, supra, pág. 134.

**D**

Es norma reiterada en nuestro sistema de derecho que, en ausencia de pasión, perjuicio, parcialidad o error manifiesto, los tribunales apelativos no deben intervenir con la apreciación de la prueba de los tribunales de instancia. *Rodríguez v. Urban Brands*, 167 DPR 509, 522 (2006). La deferencia hacia el foro primario responde a que es el juez sentenciador el que tiene la oportunidad de recibir y apreciar toda la prueba testifical presentada, de escuchar la declaración de los testigos y evaluar su comportamiento. *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 67 (2009). No obstante, es meritorio enfatizar que la doctrina de deferencia judicial no es carácter absoluto; se pudiere intervenir "cuando la apreciación de la prueba no representare el balance más racional, justiciero y jurídico de la totalidad de la prueba". *González Hernández v. González Hernández*, 181 DPR

746, 777 (2011). Además, se exceptúan de la regla de deferencia las determinaciones de hecho que se apoyan exclusivamente en prueba documental o pericial, ya que los tribunales apelativos están en idéntica posición que el tribunal inferior al examinar ese tipo de prueba. *Íd.*

Esbozada la norma jurídica, procedemos a aplicarla al recurso antes nos.

**III**

Como primer señalamiento de error, la parte apelante esgrime que el foro primario erró al determinar que la causa de acción prescribió interrumpido el término prescriptivo por medio de un escrito titulado *Notificación y Reclamación Extrajudicial,* notificado por correo certificado el 31 de agosto de 2016 y recibido el 2 de septiembre del mismo año por el Dr. Pillot Costas. Especifica que los alegados daños ocurrieron durante el periodo del 2 al 7 de septiembre de 2015 y la demanda fue incoada el 6 de junio de 2017. Le asiste la razón en parte.

En la *Sentencia* apelada no existe una conclusión de derecho que disponga el asunto de prescripción. Tampoco se dictó sentencia desestimatoria por estar prescrita la causa de acción de los apelantes. En la *Sentencia* apelada, el foro primario expresó lo siguiente:

> Finalizada la prueba testifical y pericial de ambas partes, se presentó por la parte [apelada] una solicitud de desestimación por prescripción que había quedado en suspenso por la Orden del Tribunal del 25 de enero de 2018 y, además [,] se presentó una Moción de Desestimación en los méritos del caso a base de la prueba pericial traída a la atención de este Tribunal por las partes en el caso. Ambas mociones fueron argumentadas por ambas partes, por lo que este Tribunal está en posición de resolverlas [.][12]

Sin embargo, en las conclusiones de derecho de la *Sentencia* el foro de instancia no resolvió el asunto de prescripción, solo

---

[12] Apéndice I del recurso, págs. 1-34.

adjudicó lo relacionado a la presunta negligencia por impericia médica. Inclusive, en la determinación apelada no se provee literatura jurídica sobre la prescripción, aun cuando en el tracto procesal hizo constar la solicitud de desestimación por prescripción promovida por la parte apelada. No obstante, en las determinaciones de hecho, el foro primario hizo constar en dos ocasiones, en su determinación de hecho número nueve (9) y número doce (12), que la causa de acción estaba prescrita para la parte apelante. En una ocasión por falta de identidad en informar al apelado en qué consistía la posible reclamación en la comunicación extrajudicial enviada con intención de interrumpir el término prescriptivo, y en otra ocasión por haber radicado la reclamación transcurrido el término prescriptivo.

Por tratarse de un asunto jurisdiccional que se debe atender con primacía, procedemos a evaluar si la causa de acción por negligencia médica estaba prescrita al momento de la apelante incoar la demanda.

Conforme esbozáramos, las acciones de daños prescriben por el transcurso de un (1) año desde que lo supo la persona agraviada. La teoría cognoscitiva del daño dispone que el término comienza a correr desde que la persona agraviada conoce: (1) Del daño o desde que razonablemente debió conocerlo; (2) Quién fue el autor del mismo; (3) Elementos necesarios para ejercitar la causa de acción. Sin embargo, existen tres maneras de interrumpir un término prescriptivo, siendo una de ellas la reclamación extrajudicial. En particular, para que una reclamación extrajudicial logre tener un efecto interruptor, lo esencial es que la reclamación sea una manifestación inequívoca de quien, amenazado con la pérdida de su derecho, expresa su voluntad de no perderlo.

Nuestro ordenamiento jurídico no exige una forma específica para interrumpir la prescripción de forma extrajudicial. No obstante, se han señalado ciertos requisitos que debe cumplir una reclamación extrajudicial para que opere una interrupción de la prescripción: (1) la oportunidad: la reclamación debe ser oportuna, lo cual requiere que se realice antes de la consumación del plazo; (2) la legitimación: la reclamación debe ser hecha por el titular del derecho o acción cuya prescripción se quiere interrumpir; (3) la idoneidad: se requiere idoneidad del medio utilizado para realizar la reclamación; y (4) la identidad: debe existir identidad entre el derecho reclamado y aquel afectado por la prescripción. Es decir, la reclamación extrajudicial puede plasmarse a través de distintos actos, pero todos ellos han de cumplir con los requisitos genéricos de oportunidad, identidad, legitimación e idoneidad antes reseñados. Asimismo, al establecer la identidad, se debe cumplir con que la acción ejercitada ha de responder exactamente al derecho que está afectado por la prescripción.

En el caso de autos, la carta de *Notificación y Reclamación Extrajudicial* cumplió con los requisitos necesarios para que interrumpiera el término prescriptivo aplicable, pero la interrupción solo se dio a favor de Vargas Matos, ya que fue quien único presentó la reclamacion extrajudicial. En la referida carta, la señora Vargas Matos expuso lo siguiente:

1 de septiembre de 2016

Dr. Juan Pillot Costas
Muñoz Rivera 135, Suite 2
Guayanilla, PR 00656
Tel. 787-835-5956
Vía Correo Certificado

RE: NOTIFICACIÓN DE RECLAMACIÓN EXTRAJUDICIAL

Sirva la presente para extenderle un cordial saludo y [,] a la vez [,] notificarle que soy el representante legal de la Sra. Nereida Vargas Matos; quien el pasado 2 de septiembre de 2015 fue llevada a la sala de emergencias del Hospital Metropolitano Dr. Tito Mattei

en Yauco [,] donde permaneció hasta el 7 de septiembre de[l] mismo año cuando fue dada de alta por recomendación de usted.

Estamos evaluando el tratamiento brindado en las distintas áreas del Hospital. Sin embargo para poder tomar una determinación concienzuda en torno a [la] culpa o negligencia de esta institución, médicos y/o contratistas [,] necesitamos que se nos informe si la Sra. Nereida Vargas Matos es paciente de su oficina, y de ser así [,] muy humildemente solicitamos [que] se provea copia del récord médico de la Sra. Nereida Vargas Matos.

**Por este medio, se expresa nuestra intención real e inequívoca de que esta notificación se tome como una reclamación extrajudicial que interrumpa cualesquiera términos prescriptivos para interponer cualesquiera causas de acción que tengamos disponibles de conformidad con las leyes aplicables.**

Se les ofrece comunicarse con [este] servidor para discutir cualesquiera pormenores de la presente solicitud y/o reclamación. Sin nada más por el momento [,] queda de usted[.]

Muy cordialmente,

Lcdo. José M. Bracete Almodóvar [13]

Como establecimos previamente, como excepción a la regla de deferencia judicial, los tribunales apelativos tenemos la facultad de intervenir en la apreciación de la prueba hecha por el foro primario cuando esta se apoya exclusivamente en la prueba documental y pericial. Cuando esto ocurre, como tribunal apelativo nos encontramos en la misma posición que el tribunal de instancia para examinar la prueba. Es por esto que, estamos en posición de evaluar la *Notificación y Reclamación Extrajudicial* que surge del caso de autos. Al hacer un estudio de la citada misiva, determinamos que la misma constituye una interrupción adecuada del término prescriptivo, debido a que la carta establece expresamente el derecho que se quiere ejercitar. Ello queda evidenciado en el párrafo que hace mención de la intención real e inequívoca de que la notificación se tomara como una reclamación

---

[13] Apéndice II del recurso, pág. 36. (Énfasis nuestro).

extrajudicial con aras de interrumpir los términos prescriptivos para interponer una causa de acción de conformidad con las leyes aplicables.

Interpretada la precitada misiva, a la luz de los principios expuestos, es forzoso concluir que esta constituye un claro requerimiento extrajudicial de reparación de los daños alegadamente causados por la parte apelada y que, por consiguiente, tuvo el efecto de interrumpir el término prescriptivo de la causa de acción presentada por Vargas Matos. Sin embargo, a pesar de que la reclamación fue incoada por cinco (5) demandantes, la interrupción solo procede con respecto a Vargas Matos y sus hijos a quienes esta representa.

Sobre este particular, es meritorio aclarar que Vargas Matos interpuso la reclamación por sí, y en representación de sus hijos menores de edad, Jowan y Dhael Vargas. Si bien no se hizo mención de los menores en la misiva extrajudicial, estos tenían derecho a reclamar una partida por los daños alegadamente sufridos por su madre a consecuencia de la negligencia del Dr. Pillot Costas. De probarse la causa de acción por negligencia, estos tenían un año posterior a cumplir la mayoría de edad para incoar su causa de acción en contra del Dr. Pillot Costas.

No obstante, la causa de acción estaba prescrita en cuanto a Vargas Morales y Matos Casino, los padres de Vargas Matos. Los alegados daños causados por el Dr. Pillot Costas ocurrieron del 4 al 7 de septiembre de 2015, mientras que la *Notificación y Reclamación Extrajudicial* fue recibida el 1 de septiembre del 2016. Como se puede apreciar en la carta, la misma carece de datos que le hayan permitido al Dr. Pillot Costas conocer la identidad de Vargas Morales y Matos Casiano para darse por enterado de la posible reclamación que sería incoada en su contra por parte de estos.

Al no interrumpirse para los padres de Vargas Matos, estos tenían hasta el 7 de septiembre de 2016 para presentar su reclamación. No obstante, la demanda fue radicada el 6 de junio de 2017. Al no ser incluidos en la comunicación extrajudicial, determinamos que la causa de acción de Vargas Morales y Matos Casiano se encontraba prescrita al momento de la presentación de la demanda. En virtud de lo anterior, colegimos que el Tribunal de Primera Instancia erró parcialmente al incluir las determinaciones de hechos número nueve (9) y número doce (12) en la *Sentencia* apelada, en donde el foro primario estableció que la causa de acción estaba prescrita para la parte demandante cuando solo se encontraba prescrita para los padres de Vargas Matos.

Por otro lado, como segundo señalamiento de error la parte apelante esboza que erró el foro de instancia al concluir que el Dr. Pillot Costas no actuó negligentemente en el tratamiento médico brindado a la paciente Vargas Matos. Sobre este particular, argumenta que el Dr. Pillot Costas no actuó conforme a las guías para el tratamiento médico de infarto isquémico cerebral agudo, emitidas en el 2013 y adoptadas por la comunidad médica, donde se recomienda tratamiento con agentes antiplaquetarios (como Aspirina o Plavix) en un periodo de 24 a 48 horas luego de un evento. No le asiste la razón.

Es requisito esencial en los casos de daños por impericia médica que la parte que arguye haber sufrido un daño le provea al tribunal evidencia suficiente para controvertir la presunción de corrección del tratamiento médico brindado por el facultativo médico. Por lo tanto, la negligencia del médico no se presume por el mero hecho de que el paciente haya sufrido un daño o porque el tratamiento médico no haya tenido éxito. En una acción de impericia médica, la parte demandante tiene que probar por preponderancia de la prueba que el daño ocurrido se debió, con

mayor probabilidad, a la negligencia que se le imputa. Debe, además, establecer que el tratamiento ofrecido por la parte demandada fue el factor que con mayor probabilidad causó el daño, estableciendo así el vínculo causal requerido por el Artículo 1802 del Código Civil de 1930, *supra.*

De un estudio de la transcripción de la prueba oral, del expediente ante nos, y de los autos originales, queda claramente evidenciado cómo el Dr. Miranda Delgado, perito de la parte apelante, no proveyó la literatura médica suficiente para establecer la alegada negligencia cometida por el Dr. Pillot Costas en el tratamiento que le brindó a Vargas Matos. De igual forma, se desprende de la transcripción que el Dr. Miranda Delgado, carecía de conocimiento sobre los récords médicos de Vargas Matos en donde se estableció que, con posterioridad a la intervención del Dr. Pillot Costas, se continuó el tratamiento administrado por este a Vargas Matos. Finalmente, y como hecho esencial de la reclamación, contrario a lo alegado por la parte apelante en su demanda, de la transcripción de la prueba oral surge que Vargas Matos no sufrió un segundo infarto cerebral mientras estuvo en el Hospital Pavía de Yauco.[14]

Del trámite procesal del caso surge que, el Dr. Miranda Delgado en su informe pericial señaló las identificaciones 2(a), 2(b), 2(c) y 2(d). Las referidas identificaciones fueron posteriormente eliminadas luego de realizado el *voir dire* de los documentos, por ser literatura médica publicada con posterioridad a los hechos del caso. Los hechos del presente caso ocurrieron en el año 2015 y los documentos aún no habían sido publicados, por lo que no podían ser objeto del conocimiento médico del Dr. Pillot Costas en el manejo del tratamiento médico a la fecha del 4 al 7 de septiembre

---

[14] Transcripción de la prueba oral (TPO), Tomo II, pág. 203, líneas 13-25; pág. 204, líneas 1-11.

de 2015, conforme se dispone por la jurisprudencia en los casos de esa naturaleza. Al eliminar la documentación, se concluyó que el Dr. Miranda Delgado, no contaba con literatura médica en apoyo de su opinión pericial. Sumado a este hecho, el Dr. Miranda Delgado aceptó en corte abierta que, tanto para la preparación del informe pericial, deposición, y declaración en el juicio, este no contaba con el récord completo del Hospital La Concepción,[15] el récord médico de la oficina del Dr. Carlos Berríos,[16] ni con el récord médico de Migrant Health Center de Guánica.[17]

Por otro lado, en el contrainterrogatorio, el Dr. Miranda Delgado aceptó que, el día en que la paciente se admitió al cuidado del Dr. Juan Pillot Costas, el 4 de septiembre de 2015, a las 3:45 pm, la paciente ya tenía el diagnóstico de accidente cerebrovascular (CVA), que fue la razón por la que se llevó al Hospital Tito Mattei el 2 de septiembre de 2015. Aceptó que ese diagnóstico era correcto, y en atención al mismo, solicitó una consulta a neurología ese día. La misma se llevó a cabo el 4 de septiembre de 2015 por el Dr. Pillot Costas. Una vez se hizo el estudio de MRI el 5 de septiembre de 2015, el Dr. Miranda Delgado admitió que el cambio de medicamentos de Lovenox a Plavix era el tratamiento correcto. Sobre esto, el Dr. Miranda Delgado reconoció que la norma del manejo de los medicamentos surgía de las guías del 2015 que formaron parte del informe pericial del Dr. José Carlo Izquierdo, perito de la parte apelada.[18] Asimismo, reconoció que a la fecha del 2015, existía un debate entre la clase médica en cuanto al uso de la aspirina junto con el antiplaquetario Plavix, por lo que, entonces, debía prevalecer el criterio y el juicio del médico.[19] Por último, encontramos meritorio mencionar cómo el

---

[15] TPO, Tomo II, pág. 144, líneas 16-18.
[16] Íd, pág.145, líneas 11-12 y 24.
[17] Íd, pág.146, líneas 5-8.
[18] Íd, pág. 215, líneas 18-25; pág. 216, líneas 1-7.
[19] Íd, pág. 220, líneas 1-25.

testimonio de Vargas Matos no le mereció credibilidad al foro apelado por no recordar elementos básicos de su estadía en las facilidades hospitalarias. No pudo proveerle al tribunal ninguna información pertinente que probara su causa de acción.

Por todo lo antes expuesto, determinamos en que el foro primario no incidió en el juicio valorativo de la prueba pericial que tuvo ante sí. La parte apelante no derrotó la presunción de que el tratamiento médico que brindó el Dr. Pillot Costas a Vargas Matos fuera negligente, ni que se desviara del estándar de la mejor práctica de la medicina. Por lo tanto, en ausencia de negligencia, concluimos que procedía desestimar la causa de acción, tanto de Vargas Matos como de sus hijos, presentada en contra del Dr. Pillot Costas. En vista de ello, procede la modificación y confirmación de la determinación que nos ocupa.

**IV**

Por los fundamentos que anteceden, modificamos la *Sentencia* emitida por el foro primario el 12 de octubre de 2022. Esto es, a los fines de determinar que la causa de acción está prescrita en cuanto a Matos Casiano y Vargas Morales; no así en cuanto a Vargas Matos y sus dos hijos, Jowan Vargas y Dhael Vargas. Así modificada, confirmamos la determinación apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones